FORT WALTON SQUARE, INC., PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 5329–68. Filed March 26, 1970.

*D. P. Wingo*, for the petitioner.
*Robert G. Faircloth*, for the respondent.

656

OPINIONOPINION

## Issue 1. Depreciation of Buildings

The buildings at Fort Walton Square shopping center were constructed of concrete block. Petitioner presented the testimony of its architect, who stated that the maximum life of a concrete hollow brick building was 20 to 25 years, as distinguished from a brick masonry building which might have a physical life of 50 to 60 years. The witness predicated his estimate on the effect of changes in temperature and atmospheric conditions due to the porosity of the concrete brick. The witness could not by experience, however, relate such testimony specifically to the conditions prevailing at the Fort Walton Square shopping center. In addition, it is not clear that the witness took into account the extent to which the life of the buildings might be extended by the use of a sealant which was applied to the concrete hollow brick.

While the Court is convinced that the useful life of 40 years proposed by the respondent is not the proper basis for depreciation of shopping center store buildings constructed of concrete hollow brick, the testimony of petitioner's expert witness cannot be accepted at face value. The buildings were constructed in accordance with specifications provided by Sears, Roebuck & Co. It would hardly seem reasonable that Sears, Roebuck & Co. would provide specifications for a building which could be expected to deteriorate at or about the time of the expiration of its lease. The specifications may well have provided for a building that would meet Sears' needs at the lowest possible cost. Sears would want to be equally certain,

however, that the building was standing and in good shape at the end of its term. For Sears to specify a building having a useful life of from 20 to 25 years, when it was entering into a 20-year lease, would be "cutting it too thin." Accordingly, the Court finds the useful life of the building to be 30 years.

The Court must still consider whether, notwithstanding our finding of a useful life of 30 years for the buildings, the petitioner is entitled to amortize the cost of the buildings over a shorter period measured by the term of its ground lease from International Development Co., Inc. The respondent argues to the contrary on the grounds that the lessor and the lessee were "related persons" as defined in section 178(b) of the Code and, in the alternative, that the term of the lease was not predicated on an "arm's length" transaction.

In arguing that the lessor and lessee are "related persons" within the meaning of section 178(b), the respondent apparently recognizes that the relationship between the lessor and the lessee in this case does not come within any of the statutory definitions of "related persons." A reading of the statute makes this clear. Section 178(b) provides:

(b) RELATED LESSEE AND LESSOR.—

(1) GENERAL RULE.—If a lessee and lessor are related persons (as determined under paragraph (2)) at any time during the taxable year then, in determining the amount allowable to the lessee as a deduction for such taxable year for exhaustion, wear and tear, obsolescence, or amortization in respect of any building erected (or other improvement made) on the leased property, the lease shall be treated as including a period of not less duration than the remaining useful life of such improvement.

(2) RELATED PERSONS DEFINED.—For purposes of paragraph (1), a lessor and lessee shall be considered to be related persons if—

(A) the lessor and the lessee are members of an affiliated group (as defined in section 1504), or

(B) the relationship between the lessor and lessee is one described in subsection (b) of section 267, except that, for purposes of this subparagraph, the phrase "80 percent or more" shall be substituted for the phrase "more than 50 percent" each place it appears in such subsection.

For purposes of determining the ownership of stock in applying subparagraph (B), the rules of subsection (c) of section 267 shall apply, except that the family of an individual shall include only his spouse, ancestors, and lineal descendants.

It is not claimed that the lessor and the lessee are members of an "affiliated group" as defined in section 1504. It then becomes necessary to determine whether the relationship between the lessor and the lessee is one described in subsection (b) of section 267. That section provides:

(b) RELATIONSHIPS.—The persons referred to in subsection (a) are:

(1) Members of a family, as defined in subsection (c)(4);

(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

(3) Two corporations more than 50 percent in value of the outstanding stock of each of which is owned, directly or indirectly, by or for the same individual, if either one of such corporations, with respect to the taxable year of the corporation preceding the date of the sale or exchange was, under the law applicable to such taxable year, a personal holding company or a foreign personal holding company;

(4) A grantor and a fiduciary of any trust;

(5) A fiduciary of a trust and a fiduciary of another trust, if the same person is a grantor of both trusts;

(6) A fiduciary of a trust and a beneficiary of such trust;

(7) A fiduciary of a trust and a beneficiary of another trust, if the same person is a grantor of both trusts;

(8) A fiduciary of a trust and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for the trust or by or for a person who is a grantor of the trust; or

(9) A person and an organization to which section 501 (relating to certain educational and charitable organizations which are exempt from tax) applies and which is controlled directly or indirectly by such person or (if such person is an individual) by members of the family of such individual.

It will be noted that the only situation in which two corporations are deemed to be "related persons" within the meaning of section 267(b) is set forth in paragraph (3) wherein one corporation must be a personal holding company or a foreign personal holding company. Respondent does not contend that either the lessor or the lessee in this case was a "personal holding company." Faced with substantially the same circumstances in a case involving a sale between two corporations, the stock of one being owned by the members of a family and the stock of the other by a trust for two members of that family, it was held that the corporations were not otherwise "related persons." *Shelden Land Co.*, 42 B.T.A. 498 (1940). That decision is determinative of the issue. Fort Walton Square, Inc., and International Development Co. were not "related persons" as defined in section 178(b).

Apparently as an afterthought, in his reply brief the respondent argues that the lease should be disregarded for purposes of depreciation of the buildings because it was not entered into in an "arm's length" transaction. In support of this, respondent cites the relationship of the stockholders of the lessor and the stockholders of the lessee. Respondent concludes:

Petitioner has offered no sound business reason for the creation of the twenty-six year sublease. The principal reason for such a transaction appears to be to effect a shorter useful life of the shopping center buildings.

The fallacy of this argument rests on the fact that, as the respondent notes elsewhere, the petitioner did not in its first return

for the fiscal year ended August 31, 1963, rely upon the term of the lease for purposes of computing the deduction for amortization of depreciation of the buildings. In the absence of evidence to the contrary, therefore, it must be assumed that whatever reasons there might have been in fixing the term of the petitioner's lease, the question of depreciation was not controlling.

In view of our holding that the petitioner and the lessee were not "related persons" as defined in section 178(b), the petitioner was entitled to amortize the cost of the buildings over the term of its lease.

### Issue 2. Depreciation of Other Property

*Heating and Air Conditioning.*—Considerable testimony was directed to the problems encountered with respect to the heating and air-conditioning equipment. Unquestionably climatic conditions in the Fort Walton area caused the more rapid deterioration of those units. Respondent acknowledges this in his brief and is willing to allow a useful life of 10 years. In the opinion of the Court, however, this would not be adequate in light of number of units which had been replaced. Accordingly, it is our opinion that the petitioner's claim of a useful life of 8 years for purposes of depreciation of the heating and air-conditioning equipment is reasonable and should be sustained.

*Electrical Fixtures and Wiring.*—In its returns, the petitioner placed a useful life of 10 years on this equipment. The evidence adduced by the petitioner related only to the fluorescent lighting fixtures as distinguished from the fuse or junction boxes and the wiring and circuitry leading to the fixtures. It must be assumed that except for the fluorescent fixtures, the remainder of the electrical wiring and equipment would have a useful life at least equal to the term of the lease with Sears, Roebuck & Co. Since no evidence was submitted with respect to the relative cost of the fluorescent light fixtures and of the other electrical equipment and wiring under this classification, the Court finds that the respondent's proposed useful life of 15 years for purposes of depreciation of the electrical fixtures and wiring is reasonable and should be sustained.

*Ceiling.*—The parties have agreed that for purposes of depreciation the useful life of the ceiling was 10 years and the Court so holds.

*Parking Lot Lighting.*—The petitioner presented evidence to show that due to climatic conditions some of the lighting fixtures had deteriorated and had been replaced. It was not clear, however, whether it was also necessary to replace the stanchions, wiring, and other elements making up the cost of the parking lot lighting. On this record, the respondent's determination of a useful life of 15 years

for purposes of depreciation of the parking lot lights is reasonable and should be sustained.

*Fence and Signs.*—Petitioner submitted no evidence concerning the useful life of the fence and signs claimed on the returns as part of the machinery and equipment account. Accordingly, respondent's determination of a useful life of 15 years for purposes of depreciation of the fence and signs is reasonable and should be sustained.

*Paving.*—The petitioner presented evidence to show that during the first 6 years approximately one third of the paving in the parking lot had been "replaced." To what extent such replacement was the equivalent in cost of laying the original surface was not made clear. In any event, since the remaining two-thirds presumably was still in use, the allowance by the respondent of a useful life of 10 years for purposes of depreciation of the parking lot is reasonable and should be sustained.

*Roof.*—The parties have agreed that for purposes of depreciation the useful life of the roof was 15 years and the Court so holds.

## Issue 3. Investment Tax Credit for Heating and Air-Conditioning Equipment

The question whether the heating and air-conditioning systems installed by the petitioner at the Fort Walton Square shopping center qualified as "section 38 property" for purposes of the investment tax credit is governed by section 48 as interpreted by regulations section 1.48–1(e)(2). That regulation provides:

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components". For special rules with respect to an elevator or escalator, the construction, reconstruction, or erection of which is completed by the taxpayer after June 30, 1963, or which is ac-

quired after June 30, 1963, and the original use of which commences with the taxpayer and commences after such date, see section 48(a)(1)(C) and paragraph (m) of this section.

The analogy between heating and air-conditioning equipment on the one hand and elevators and escalators on the other is particularly significant. In section 203(c) of the Revenue Act of 1964 (Pub. L. 88–272) the Congress amended section 48(a)(1) by the addition of subparagraph (C) in order to bring elevators and escalators within the definition of section 38 property. In its report accompanying that amendment the Committee on Ways and Means said:

A third problem arises with respect to the treatment of escalators and elevators in the case of the investment credit. Among the categories of property not eligible for the investment credit are buildings and their structural components. The House committee report indicated that the term "structural components" of a building included such parts of a building as central air conditioning and heating systems, plumbing, and electrical wiring and lighting fixtures relating to the operation and maintenance of the building. The proposed regulations issued by the Treasury Department with respect to the term "structural components" provide an extensive list of the type of items considered to be structural components and therefore not eligible for the investment credit. Among these items are escalators and elevators. *While these regulations are an accurate interpretation of the intention of Congress last year in this respect, nevertheless your committee believes that it is appropriate to reconsider the treatment of escalators and elevators for purposes of the investment credit.* Escalators and elevators are closely akin to assets "accessory to the operation" of a business which presently are eligible for the investment credit. These assets include machinery, printing presses, transportation or office equipment, refrigerators, individual air-conditioning units, grocery counters, etc. Your committee further believes that new elevator and escalator equipment represents an important aspect of modernization of plant and facilities. [Emphasis added.]

What was said with respect to elevators and escalators would apply with equal force to heating and air-conditioning equipment if the Congress had so elected. The fact that the Congress did not do so is strong evidence of an intent to apply a stricter rule with respect to heating and air-conditioning equipment. In the face of this intent, regulations section 1.48–1(e)(2) must be accepted as having the full force and effect of law. In fact, in light of this legislative history, the accompanying rulings by the respondent dealing specifically with heating and air-conditioning equipment should be presumed to be in conformity with the legislative intent. See Rev. Rul. 67–359, 1967–2 C.B. 9; Rev. Rul. 67–417, 1967–2 C.B. 49.

There are two commonly accepted methods of providing heating and air conditioning for commercial areas. Under one method, a heating or cooling liquid is piped from the heating and compressor

unit to the areas to be served and air forced over radiation coils in units located within that area. Under the alternative method, the blower and coils are located at and are a part of the heating and compressor unit, and the heated or cooled air is carried by ducts to the area to be served.

The heating and air-conditioning systems installed by the petitioner were of the latter type. A complete unit consisted of equipment for heating by gas, a compressor for cooling, the radiation coils, and a forced air blower. The unit was placed on the roof of the building and connected to the ducts with canvas flashing. One or more units were installed for each tenant and the gas and electrical consumption was metered separately.

The petitioner argues that such systems are not a "central heating and air conditioning system," as referred to in regulations section 1.48-1(e)(2). In effect, the petitioner argues that any complete unit, regardless of size or the area to be served, is not a "central heating and air conditioning system" if the system operates by first cooling or heating the air and delivering that air to the area to be served rather than by heating or cooling the liquid for delivery to separate forced-air radiators within the area to be served.

We find nothing to indicate that the Congress intended thus to limit the definition of a "central heating and air-conditioning system." It is wholly unrealistic to argue, in effect, that whether a unit is a central system or an individual system depends on whether the coolant is piped to the area or the cooled air is carried to the area by ducts. In either case, there is a "central unit" capable of serving more than a single room or a single area. The fact that one or more of such units may be connected and metered separately for each tenant does not convert them into "individual" units.

In Rev. Rul. 67-417 the respondent has ruled that the term "central heating and air conditioning system" is not restricted to mean that an entire building must be served by one unit of equipment. In Rev. Rul. 67-359 the respondent also ruled that roof-type air-conditioning units such as those installed by the petitioner at the shopping center were "structural components of the building" within the meaning of regulations section 1.48-1(e)(2). The respondent's rulings with respect to such air conditioning equipment are reasonable, clearly within the intent of the Congress, and should be followed. The respondent's determination that the heating and air-conditioning systems involved in the instant case do not constitute "section 38 property" should be sustained.

*Decision will be entered under Rule 50.*