JAMES M. SAMIS AND SHIRLEY A. SAMIS, ET AL.,[1] PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7162–78, 7163–78, 7164–78.    Filed April 20, 1981.

---

[1]Cases of the following petitioners are consolidated herewith: William L. Howard, Jr., and Marjorie Howard, docket No. 7163–78; and Estate of J. Howard Edmondson, Deceased, Jeanette Edmondson, Executrix, docket No. 7164–78.

*Harold D. Hines* and *Max H. Lawrence*, for the petitioners.
*Juandell D. Glass*, for the respondent.

## OPINION

RAUM, *Judge*: The Commissioner determined deficiencies in petitioners' income taxes as set forth below:

|  | Year ended | Deficiency |
|---|---|---|
| James M. and Shirley A. Samis | Dec. 31, 1972 | $12,205.00 |
| William L., Jr., and Marjorie Howard | Dec. 31, 1972 | 3,003.00 |
| Estate of J. Howard Edmondson, deceased, Jeanette Edmondson, executrix | Feb. 28, 1974 | 1,336.31 |

James Samis, William Howard, Jr., and Jeanette Edmondson, executrix, are members of a limited partnership, Whispering Hills Energy, Ltd., which in 1972 acquired a total energy plant to furnish hot and chilled water for an apartment complex constructed by a joint venture in which petitioners have no ownership interest. The issues requiring decision are as follows: (1) Whether the total energy plant qualifies for the investment credit as "tangible personal property" or "other tangible property," or is rather a nonqualifying "building and its structural components," sec. 48(a)(1)(A) and (B), I.R.C. 1954; (2) whether the total energy plant is section 1250 property, and allowable depreciation under the declining balance method of depreciation is thus limited to an amount not exceeding 150 percent of the allowable depreciation under the straight line method pursuant to section 167(j)(1)(B), I.R.C. 1954; and (3) whether the total energy plant is "tangible personal property," as defined in section 179(d)(1), I.R.C. 1954, thereby qualifying for the additional first year depreciation allowance provided by section 179. The case was submitted on the basis of a stipulation of facts.

At the time of the filing of their petitions herein, as well as in 1972, Mr. and Mrs. Samis and Mr. and Mrs. Howard were residents of Oklahoma. Jeanette Edmondson, executrix of the Estate of J. Howard Edmondson, was a resident of Oklahoma at the time the estate's petition was filed. The issues involved herein arise solely from the participation of the husband-peti-

tioners and the executrix in a limited partnership, and they will hereinafter be referred to as petitioners.

At some time during 1971, a joint venture, consisting of Kavanaugh-Finley Corp. and IDS Mortgage Development Corp. (KF-IDS), was in the process of constructing approximately 440 apartment units on a tract of land it owned in the city of The Village, a suburb of Oklahoma City, Okla. On July 15, 1971, Total Energy, Inc. (Total Energy), entered into an agreement with KF-IDS relating to the planning, financing, installing, operating, and maintaining a combined on-site total energy plant to furnish electrical power, heating hot water and cooling chilled water, and heating of domestic water for the apartment complex being constructed by KF-IDS. Total Energy is a Nevada corporation the stock of which is held in the name of Walter M. Spradley, trustee for the beneficial owners, James M. Samis, William L. Howard, Jr., Jeanette Edmondson, executrix of the Estate of J. Howard Edmondson, and N. K. Winston Corp.

Subsequent to the execution of the agreement between Total Energy and KF-IDS, and after construction of the total energy plant had commenced, on January 17, 1972, Total Energy conveyed all its right, title, and interest in the total energy plant, the assets used therewith, and the agreement between KF-IDS and Total Energy to N. K. Winston Corp., James M. Samis, William L. Howard, Jr., and Jeanette Edmondson, executrix of the Estate of J. Howard Edmondson. The purchase price for the property assigned was $10 and the buyers' assumption of Total Energy's obligations under the agreement with KF-IDS and its debts and obligations under various financing agreements. Included among the financing agreements assumed was a $900,000 first mortgage bond agreement with Mid-Continent Life Insurance Co. and Oklahoma Natural Gas Co., which had supplied the principal financing for construction of the total energy plant and distribution system. Pursuant to the agreement, the buyers acquired various proportionate interests in the total energy plant and related assets, as hereinafter described.

By means of a limited partnership agreement and a certificate of formation, both dated January 20, 1972, the buyers formed Whispering Hills Energy, Ltd. (Whispering Hills), a limited partnership, "to acquire, construct, maintain, and operate certain equipment, machinery, and other assets capable of generat-

ing commercial amounts of total energy services * * * and [to] sell such total energy services * * * to the owners of an apartment complex." The partners contributed their respective proportionate interests in the assets constituting the total energy plant and the contract rights related thereto to the partnership; these assets were stated to have a value equal to the debts and liabilities which had been assumed by the partners under the assignment agreement with Total Energy. Under the partnership agreement, the liability of the limited partners for partnership losses was limited to their respective capital contributions. Profits and losses were to be shared in accordance with the partners' capital contributions, which initially reflected their proportionate interests in the property contributed to the partnership, as set forth below:

| Partner/class | Ownership interest |
| --- | --- |
| James M. Samis (general) | 26.667% |
| N. K. Winston Corp. (limited) | 20.000% |
| William L. Howard, Jr. (limited) | 26.667% |
| Jeanette Edmondson, executrix of the Estate of J. Howard Edmondson, deceased (limited) | 26.666% |

The partnership agreement further provided that "investment tax credits and depreciation deductions allowable on assets of the partnership shall be allocated to each partner on the basis of each such partner's percentage interest" in the partnership capital.

By virtue of the above series of transactions, Whispering Hills became the successor to Total Energy with respect to all rights and obligations arising from the written agreement between Total Energy and KF-IDS. Accordingly, Whispering Hills planned, financed, and installed an on-site energy conversion plant and distribution system to furnish hot and chilled water for heating and air-conditioning, and hot domestic water for the apartment complex constructed by KF-IDS. The costs of the energy plant and distribution system up to the point of entry to the apartments were borne by Whispering Hills, and the cost of the distribution system within the apartment buildings was borne by KF-IDS. However, Whispering Hills operates and maintains the entire energy distribution system, including all elements used in the heating and air-conditioning of the apartments.

The on-site energy plant installed by Whispering Hills consists of the following components:

| Component | Cost |
| --- | --- |
| Boiler | $16,067.20 |
| Plant electrical | 25,642.91 |
| Refrigeration | 49,494.17 |
| Water treatment | 838.20 |
| Cooling tower | 22,042.69 |
| Building | 119,404.51 |
| Pumps and pipe | 334,048.95 |
| Total costs | 567,538.63 |

The building is a concrete block structure which houses on the lower floor the gas-fired boilers, refrigeration equipment, and related equipment. Office space for personnel and space for plant expansion is on the second floor. The cooling tower for the plant is located above a portion of the below-grade structure, and adjacent to the second floor structure. The pipes used to circulate (transport) the hot and chilled water are buried from the point of the plant structure to the apartment buildings. The related pumps are mounted inside the plant structure.

Although the agreement between KF-IDS and Total Energy contemplated that Total Energy would provide electric power for the apartment buildings, Whispering Hills does not produce or distribute electricity, does not hold a franchise from the city of The Village for the purpose of producing, distributing, or selling electricity, and is not a licensed public utility. Instead, the principal business of Whispering Hills is to manufacture heating and cooling media and to sell the energy contained in the media by transporting the media to the KF-IDS apartment complex. KF-IDS is the sole and exclusive customer for the hot and cold water produced by Whispering Hills, and the energy provided by Whispering Hills through the chilled and heated water can be furnished only to the owners of the apartments within the complex constructed by KF-IDS. Under the contract assumed by Whispering Hills, KF-IDS is required to pay for these services monthly on the basis of a fixed charge per square foot of floor area in the apartments. The agreement provides that the fixed charge is to be raised or lowered for changes in Whispering Hills' costs for labor, taxes, insurance, and fuel. The contract also provides for payment for electricity provided KF-IDS and sharing of the profits from the operation of the total energy

plant; these provisions are to be inapplicable if electric power is not supplied to KF-IDS.[2] The term of the contract is 30 years, unless renewed by mutual consent; if the contract is not renewed, KF-IDS can purchase the total energy plant for 10 percent of its original cost.

The petitioners herein do not have an ownership interest in and are not related in any manner or degree, including stock ownership, to KF-IDS. Whispering Hills does not have title to the land underlying the plant building, although it has a leasehold interes. in such land pursuant to the agreement with KF-IDS, and also has easements for the distribution system.

On its 1972 return of partnership income, Whispering Hills Energy, Ltd., listed a total of $567,538.63 as the distributive amount of investments in property having a useful life of 7 or more years; this amount corresponds to the stipulated cost of the energy plant and distribution system. On their 1972 income tax return, both James M. Samis and William L. Howard, Jr., claimed investment credits based upon their respective $151,344 proportionate shares of the partnership's investment in the energy plant and distribution system. Mr. Samis and Mr. Howard each claimed a total investment credit of $10,594, although Mr. Howard's 1972 credit was limited to $2,045, the amount of tax shown on his return. The Estate of J. Howard Edmondson, in its income tax return for its taxable year ended February 28, 1974, claimed an investment credit carryover of $1,336.31; this amount represents the remaining balance of the estate's original $10,594.05 investment credit after its application to the estate's 1973 and 1972 taxable years, which are not before us. In the notice of deficiency issued to petitioners, the Commissioner determined that the investment credit was not allowable because the property acquired by Whispering Hills Energy, Ltd., in 1972 was not qualified property, under section 38, I.R.C. 1954.

Whispering Hills Energy, Ltd., reported a net loss of $124,703.32 on its 1972 return; one of the deductions claimed on the return was depreciation of $50,219.83, which reflected

---

[2]As previously noted, it was stipulated that Whispering Hills does not supply electric power to KF-IDS and does not have a franchise to supply electricity. It appears that the parties' desire to have Whispering Hills supply electricity to KF-IDS was frustrated as a result of litigation. See *Oklahoma Gas & Electric Co. v. Total Energy, Inc.*, 499 P.2d 917 (Okla. 1972).

depreciation on the energy plant and distribution system computed under the double declining balance method over a useful life of 22.5 years. The partnership return also claimed a $2,000 allowance for additional first year depreciation under section 179, I.R.C. 1954. Mr. Samis and Mr. Howard deducted their respective shares of the partnership loss and deduction for additional first year depreciation on their 1972 returns. The Commissioner determined that the partnership property was section 1250 property, and that allowable depreciation under the declining balance method was therefore limited to 150 percent of the allowable depreciation under the straight line method. The Commissioner further determined that the partnership property was real property and that additional first year depreciation was accordingly not allowable. As a result, the Commissioner increased the taxable incomes of Mr. Samis and Mr. Howard to reflect the foregoing adjustments in respect of the partnership. The notice of deficiency issued to the Estate of J. Howard Edmondson does not contain any such adjustments.

(1) *Investment credit.*—Section 38, I.R.C. 1954, provides for the allowance of a credit against tax for qualified investments in certain depreciable property. Section 38 property is defined in section 48(a)(1)[3] as "tangible personal property" or "other tangible property (not including a building and its structural components)" used in production or manufacturing or in furnishing various services. Section 1.48–1(c), Income Tax Regs., defines "tangible personal property" as "any tangible property except land and improvements thereto, such as buildings or other

---

[3]Sec. 48(a)(1), I.R.C. 1954, as in effect for 1972, and prior to its amendment by sec. 301(d)(1) of the Energy Tax Act of 1978, Pub. L. 95–618, 92 Stat. 3174 (1978), provided in relevant part as follows:

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *

\* \* \* \* \* \* \*

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

inherently permanent structures (including items which are structural components of such buildings or structures)." Qualifying "other tangible property" includes "any other tangible property (but not including a building and its structural components) used as an integral part of manufacturing * * * [or] production * * * or as an integral part of furnishing * * * electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service." Sec. 1.48–1(d)(1), Income Tax Regs.

Petitioners contend that the entire energy facility is used in the production of energy, and therefore qualifies as either "tangible personal property" or "other tangible property" within the meaning of section 48(a)(1)(A) and (B). With respect to the concrete block structure housing the boilers and other equipment, the Government argues that this structure is a "building," and that buildings do not qualify as section 38 property under the regulations.[4] The Government further contends that under the applicable Treasury regulations,[5] the entire energy facility is excluded from the definitions of both "tangible personal proper-

---

[4]Sec. 1.48–1(e)(1), Income Tax Regs., provides as follows:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

[5]Sec. 1.48–1(e)(2), Income Tax Regs., provides in relevant part as follows:

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. * * *

ty" and "other tangible property" because it is part of a central heating and air-conditioning system for the apartments constructed by KF-IDS and is thus a "structural component" of a building.

We find that the concrete block structure was not section 38 property, since petitioners have failed to establish that the building was a special purpose facility that could not be used for purposes other than energy production. Moreover, with respect to the total energy plant as a whole, we find that it is a structural component of the KF-IDS apartment buildings, and thus is not section 38 property.

In determining whether a structure is a "building" and therefore not section 38 property, the term "building" should be given its commonly accepted meaning. See, e.g., *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. 768, 793 (1980); S. Rept. 1881, 87th Cong., 2d Sess. 154–155 (1962); H. Rept. 1447, 87th Cong., 2d Sess. A18 (1962). Although the stipulation does not describe the concrete block structure in great detail, its outward appearance is surely that of a "building" as that word is commonly understood. In any event, to the extent that the record is unclear in that respect, the burden of proof was upon petitioners, and they must take the consequence of any inadequacy of proof. Moreover, the stipulation indicates that the structure also provides office space, one of the functions of a "building" specified in the regulations. Sec. 1.48–1(e)(1), Income Tax Regs., note 4 *supra*. Nonetheless, despite their appearance and function as buildings, the regulations provide that some structures will not be so classified if they fit within certain exceptions. One such exception, which petitioners seek to invoke herein, is for structures used for housing property used as an integral part of a production process. If the structure's use is so closely tied to the equipment it houses that the structure will clearly be replaced when the equipment is replaced, it will not be classified as a "building." Factors indicating that the structure fits within this exception are (1) the structure is specially designed to provide for the demands of the equipment it houses, and (2) the structure cannot profitably be converted to other uses. See sec. 1.48–1(e)(1), Income Tax Regs., note 4 *supra*. Petitioners have failed to establish that the structure is not properly classified as a "building."

In order to fit within the aforementioned exception described

by the regulations, the structure must be little more than a shell for the equipment it houses. *Valmont Industries, Inc. v. Commissioner*, 73 T.C. 1059, 1075 (1980); *Endres Floral Co. v. United States*, 450 F. Supp. 16, 25–26 (N.D. Ohio 1977); see S. Rept. 92–437, 92d Cong., 1st Sess. 29–30 (1971). The current use of the structure involved herein appears to go beyond activities integrally related to the operation of the energy production equipment, since it is stipulated that the second floor of the structure contains office space. Furthermore, petitioners have not called our attention to any special features of the structure which would make it unusable if the energy production equipment was removed; indeed, in addition to office space, the second floor of the building is stipulated to contain space for plant expansion, and there is no showing that this area could not be put to some use if plant expansion proved to be unnecessary. In the circumstances, we find that the concrete block building was indeed a "building," and that the building component of the total energy plant therefore does not qualify as section 38 property.

We further find that the partnership's total energy plant and distribution system are integral parts of a "central air conditioning or heating system," and are thus structural components of a building. See sec. 1.48–1(e)(2), Income Tax Regs., note 5 *supra*. As such, the total energy plant cannot qualify as section 38 property as either "tangible personal property," see sec. 1.48–1(c), Income Tax Regs., or "other tangible property," sec. 48(a)(1)(B), I.R.C. 1954, and sec. 1.48–1(d)(1), Income Tax Regs.

The statute states that the category of "other tangible property" does not include "a building and its structural components." Sec. 48(a)(1)(B), I.R.C. 1954, note 3 *supra*. Likewise, the regulations indicate that "tangible personal property" does not include "land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)." Sec. 1.48–1(c), Income Tax Regs. The term "structural components" is defined in the regulations to include (sec. 1.48–1(e)(2), Income Tax Regs.):

such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; *all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts;*

plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. [Emphasis supplied.]

These regulations were issued pursuant to a specific statutory grant of authority, see sec. 38(b), I.R.C. 1954, and their authority is further supported by statements in congressional committee reports indicating that the regulations were an accurate interpretation of legislative intent. S. Rept. 830, 88th Cong., 2d Sess. 41–42 (1964); H. Rept. 749, 88th Cong., 1st Sess. 35 (1963); see *Kramertown Co. v. Commissioner*, 488 F.2d 728, 730–731 (5th Cir. 1974); *Fort Walton Square, Inc. v. Commissioner*, 54 T.C. 653, 661 (1970).

As we recently stated in *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. at 797, "The thrust of this regulation is that an item will be a 'structural component' of a building if it is an integral and permanent part of the structure, the removal of which will affect the essential structure of the building." See *King Radio Corp. v. United States*, 486 F.2d 1091, 1095 (10th Cir. 1973); Rev. Rul. 75–178, 1975–1 C.B. 9. Petitioners have failed to establish that Whispering Hills' total energy plant was anything more than an integral and permanent part of a central heating and air-conditioning system for the KF-IDS apartment complex, and we therefore conclude that it is a structural component of the buildings in the apartment complex.

The total energy plant operates as an essential part of the apartment complex. It supplies hot and chilled water for heating and air-conditioning the apartment buildings, and also supplies hot water for domestic use in the apartment buildings. These services are customarily provided by a landlord and are necessary for the operation of the apartment complex. In the absence of the total energy plant, KF-IDS would have to construct its own central heating and air-conditioning system and facilities to provide hot water for domestic use. There is no indication in the record that such services could be obtained from local public utilities or other sources. Cf. *Westroads, Inc. v. Commissioner*, 69 T.C. 682, 688–689 (1978). Whispering Hills does not operate as an independent supplier of energy, since the energy provided by Whispering Hills can be furnished only to the owners of the apartments within the complex constructed by KF-IDS. Moreover, Whispering Hills is contractually obligated to provide

maintenance for the entire heating and air-conditioning system as a unit, including the part of the system within the apartment buildings. Thus, it seems clear that the total energy plant operates as an integral part of a central air-conditioning and heating system for the KF-IDS apartment buildings.

It is equally clear that the total energy plant is a relatively permanent part of the KF-IDS apartment complex. First of all, the most costly components of the total energy plant, the building and the pumps and pipe, appear to be installations of an inherently permanent nature. Petitioners certainly have not called our attention to any evidence that these items, or the other components of the total energy plant, were readily removable. Furthermore, aside from the obvious difficulties in removing the components of the total energy plant, contractual provisions assured KF-IDS that the total energy plant would be a relatively permanent part of the apartment complex. The term of the contract for operation and maintenance of the energy plant is for 30 years, subject to extension by mutual consent, and KF-IDS has the right to purchase the total energy plant for 10 percent of its original cost if the contract is not renewed. KF-IDS retains title to the land on which the plant is located, granting only a leasehold interest in the land to Whispering Hills. In the event that Whispering Hills fails to provide the energy services required by KF-IDS, KF-IDS reserves the right to terminate the contract and succeed to the ownership of the plant and distribution system. In the circumstances, we find that Whispering Hills' total energy plant is an integral and permanent part of the air-conditioning and heating system of the KF-IDS apartment complex, rather than an independent supplier of energy services. Accordingly, despite the separate ownership of the energy plant and the apartment buildings,[6] the energy plant must be classified as a structural component of a building under

---

[6]The separate ownership of the energy plant should not obscure the essential matter under consideration. Certainly, if KF-IDS had itself constructed and operated the plant, it would clearly have to be treated as an integral and structural component of the entire apartment complex, and would not qualify for the investment credit. It can hardly be assumed that Congress intended to allow the credit in respect of the identical structure merely because KF-IDS arranged to have it installed and operated pursuant to contract by another entity which engaged in no other business. Bearing in mind the basic objective which Congress sought to achieve by means of the investment credit (see S. Rept. 1881, 87th Cong., 2d Sess. 10–12 (1962), H. Rept. 1447, 87th Cong., 2d Sess. 7–9 (1962)), the separate ownership of the energy plant in the present circumstances is wholly irrelevant.

the regulations. Since the total energy plant is a structural component of a building, it therefore does not qualify as section 38 property. See *Kramertown Co. v. Commissioner*, 488 F.2d at 729–731; *Fort Walton Square, Inc. v. Commissioner*, 54 T.C. at 661–662; *Dixie Manor, Inc. v. United States*, an unreported case (W. D. Ky. 1979, 44 AFTR 2d 79–5442, 79–5444 – 79–5445, 79–2 USTC par. 9469 at 87,707–87,708).

(2) *Depreciation.*—Our resolution of the investment credit issue also resolves the issue of whether the partnership was entitled to depreciate the total energy plant under the double declining balance method of depreciation.[7] Section 167(b) permits property used in a trade or business to be depreciated under the declining balance method, with the allowable depreciation not to exceed twice the amount that would have been allowed if the straight line method had been used. However, section 167(j)(1)(B) limits the depreciation allowance under the declining balance method of depreciation to an amount not exceeding 150 percent of the straight line amount if the property in question is section 1250 property. Section 1250 property is defined in section 1250(c) as any depreciable real property other than section 1245 property. Section 1245 property is in turn defined in section 1245(a)(3) as depreciable property which is either—

(A) personal property, [or]
(B) other property (not including a building or its structural components) * * * which * * *
(i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *

The regulations under this section define "personal property" as "Tangible personal property (as defined in paragraph (c) of sec. 1.48–1, relating to the definition of 'section 38 property' for purposes of the investment credit)." Sec. 1.1245–3(b), Income Tax Regs. Property described in section 1245(a)(3)(B) is defined as "tangible property of the requisite depreciable character other than personal property (and other than a building and its structural components)" (sec. 1.1245–3(c)(1), Income Tax Regs.),

---

[7]Petitioners have not argued that the energy plant might be part of an integrated unit of residential rental property, see sec. 1.167(j)–3(b), Income Tax Regs., and thereby be entitled to use the double declining balance method of depreciation by virtue of sec. 167(j)(2), I.R.C. 1954.

with the terms "building" and "structural components" having the same meanings as in section 1.48–1(e), Income Tax Regs. See sec. 1.1245–3(c)(2), Income Tax Regs. Since we have already found that Whispering Hills' total energy plant is a structural component of a building, as defined in section 1.48–1(e), Income Tax Regs., and accordingly is neither "tangible personal property" nor "other tangible property," this conclusion governs the classification of the plant as section 1250 property. Allowable depreciation under the declining balance method is therefore limited to an amount not in excess of 150 percent of the allowable straight line depreciation. The partnership's 1972 loss must accordingly be reduced to reflect this adjustment, and petitioners' distributive shares of that loss must be likewise reduced in accordance with the Commissioner's deficiency determinations.

(3) *Additional first year depreciation allowance.*—Section 179, I.R.C. 1954, permits a taxpayer to elect to deduct an additional allowance for depreciation of "tangible personal property" equal to 20 percent of the cost of such property in the first year the property is placed in service, subject to certain dollar limitations. The regulations define "tangible personal property" to include "any tangible property except land, and improvements thereto, such as buildings or other inherently permanent structures thereon (including items which are structural components of such buildings or structures)." Sec. 1.179–3(b), Income Tax Regs. The regulation also indicates that the term does not include "central heating or central air conditioning machinery, pipes, or ducts." Sec. 1.179–3(b), Income Tax Regs. These provisions are substantially identical to the provisions defining "tangible personal property" for purposes of the investment tax credit in section 1.48–1(c), and (e), Income Tax Regs., and they should be given a consistent interpretation. See *Kimmelman v. Commissioner*, 72 T.C. 294, 307 (1979); *LaCroix v. Commissioner*, 61 T.C. 471, 484–485 (1974); *Moore v. Commissioner*, 58 T.C. 1045, 1055 (1972), affd. per curiam 489 F.2d 285 (5th Cir. 1973); *Estate of Morgan v. Commissioner*, 52 T.C. 478, 482 (1969), affd. per curiam 448 F.2d 1397 (9th Cir. 1971). We have found that Whispering Hills' total energy plant is not "tangible personal property" for purposes of the investment credit; for the reasons set forth above, we likewise find that the total energy plant is a structural component of a building or other inherently perma-

nent structure and therefore does not qualify as "tangible personal property" for purposes of the additional first year depreciation allowance provided by section 179.

*Decisions will be entered for the respondent.*