CIRCLE K CORPORATION AND CONSOLIDATED SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Circle K Corp. & Consol. Subsidiaries v. Commissioner
Docket No. 3542-80.
United States Tax Court
T.C. Memo 1982-298; 1982 Tax Ct. Memo LEXIS 456; 43 T.C.M. (CCH) 1524; T.C.M. (RIA) 82298; May 26, 1982. A. Jerry Busby, for the petitioners. Michael K. Phalin, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a deficiency of $ 172,527 in petitioners' Federal income tax for the taxable year ended April 30, 1976, and imposed an addition to tax of $ 8,626 under section 6653(a). [1] The issues for decision are: 1. Whether certain property qualifies as section 38 property *457 so as to entitle petitioners to investment credits claimed therefor. 2. Whether any part of the underpayment of petitioners' Federal income tax was due to negligence or intentional disregard of rules and regulations under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Circle K Corporation (hereinafter petitioner) is a Texas corporation. Its principal place of business was in Phoenix, Arizona, when the petition in this case was filed. For the taxable year ended April 30, 1976, Circle K Corporation and consolidated subsidiaries filed a consolidated income tax return with the Internal Revenue Service Center, Ogden, Utah. Issue 1: Investment Credit
A. Air Conditioning Units
During the taxable year ended April 30, 1976, petitioner operated approximately 1,100 retail convenience stores throughout several states, including Arizona. Petitioner constructed all of the stores it occupied in the Phoenix metropolitan area. After construction, most of those stores were occupied by petitioner pursuant to the provisions of sale and leaseback agreements entered into with unrelated third parties, while a few of the *458 stores were occupied by petitioner as owner. Pursuant to the terms of the sale and leaseback agreements only the land and basic building were sold; the equipment and fixtures used in the stores were purchased by and remained the property of petitioner. Upon the termination of the typical lease, petitioner, as lessee, could remove all of the equipment and fixtures. All of the Phoenix stores were originally constructed with one or two roof-top evaporative coolers. The evaporative coolers were originally installed in the stores as the most economical means available of providing for the comfort of petitioner's employees and customers. They were attached to the roof by short metal screws and duct tape. Each cooler had its own electrical connection running from an electrical service box on the side of the building up over the roof to the cooler. The treated air produced by the evaporative coolers was distributed to the interior of the stores through a short direct duct through the roof and ceiling and a simple air register inside the stores. During the high humidity periods of the summer, the evaporative coolers actually increased the level of humidity within the stores. The *459 increased humidity created by the evaporative coolers collected on the walk-in doors, obscured merchandise in refrigerated boxes, and caused water to drip onto the floor and form puddles thereby creating a safety hazard. In addition, the high humidity generated by the evaporative coolers caused some of petitioner's shelf goods to spoil. On July 12, 1975, petitioner decided to install roof-top air conditioning units in all of its Phoenix stores. Prior to its decision to install the air conditioning units, petitioner never determined the amount of money it was losing through the spoilage of shelf goods due to high humidity. During the year in issue petitioner purchased and installed approximately 243 air conditioning units in its Phoenix stores.One or two units were installed on the roof of each of the Phoenix stores. The one or two units installed by petitioner cooled the entire store, were self-contained, and were either attached directly to the roof by short metal screws or rested upon wooden framing which was attached to the roof. In some instances, the treated air produced by the air conditioning units was distributed to the interior of the store through a short direct duct *460 through the roof and ceiling and a simple air register inside the store, while in other instances the units were connected to the same duct which led from a preexisting evaporative cooler through the roof and into the store. The electricity for the units came from an electrical service box on the side of the building, a connection from which ran up to the roof and over to the units. Any preexisting and operating coolers were left in place upon the installation of the air conditioning units and were used instead of the air conditioning units when the humidity was low enough to allow them to operate efficiently. [2]
On its return for the taxable year ended April 30, 1976, petitioner claimed an investment tax credit under section 38 for the cost of the air conditioning units. [3] In the notice of deficiency, respondent determined that petitioner was not entitled to the claimed investment credit because the air conditioning units are not section 38 property. *461 B. Cold Storage Room
Petitioner operated an ice manufacturing plant in Phoenix during the year in issue. The plant manufactures and packages cubed and blocked ice for distribution both to petitioner's stores under the Circle K label and to other distributors under private label. Sometime during the year in issue, petitioner constructed a rectangular addition to the ice plant consisting of a structure approximately 100 feet by 110 feet (hereinafter sometimes referred to as "the cold storage room"). [4] A temperature below 32 degree fahrenheit is maintained in the cold storage room through the use of several refrigeration units attached to its walls. The exterior walls of the cold storage room are constructed of concrete and the interior walls consist of galvanized sheet metal with four inches of insulation between the concrete and the sheet metal. The ceiling of the cold storage room consists of two layers of galvanized sheet metal with insulation between the layers, and the floor is concrete with insulation beneath the concrete. The entire floor space of the cold storage room is available as open and unobstructed storage space. The cold storage room has a loading dock *462 at one end and a wide opening onto the loading dock which is equipped with sliding doors. Petitioner's ice plant is fully automated. It has eight ice making machines, consisting of both fifteen and thirty ton machines. Each bag of block ice or ice cubes weighs approximately eleven to thirteen pounds. After the cubed or blocked ice is bagged by the machine, the bags of ice cubes are stacked on either pallets or carts and the bags of blocked ice are put in bins which are placed in either the cold storage area in the original ice plant or the newly constructed cold storage room. Prior to the construction of the cold storage room, the bagged ice was stored solely in the cold storage area of the original ice plant. Since the construction of the cold storage room, the cold storage area in the original ice plant is filled first and then the cold storage room is used. The ice remains in cold storage until it is loaded into trucks for delivery. On its return for the taxable year ending April 30, 1976, petitioner *463 claimed an investment tax credit under section 38 for the structural cost of the cold storage room. [5] In the notice of deficiency, respondent determined that petitioner was not entitled to the claimed investment credit because the cold storage room does not constitute section 38 property. Issue 2: Sec. 6653(a) Addition to Tax
In 1975, respondent audited petitioner for its taxable years ended April 30, 1974 and April 30, 1975. During the course of this audit, respondent determined that petitioner had failed to report the recapture of investment credits arising from its early disposition of section 38 property during those taxable years. On May 17, 1976, respondent received an agreement signed on behalf of petitioner by Don Gehringer, petitioner's vice president and comptroller, consenting to his determinations with respect to petitioner's investment credit recapture for the taxable years ended April 30, 1974 and April 30, 1975. Petitioner's *464 return for the taxable year in issue was filed on November 15, 1976, and signed on behalf of petitioner by Mr. Gehringer. During the course of respondent's audit of the taxable year in issue, he determined that petitioner had again failed to report the recapture of investment credits arising from the early disposition of section 38 property during such year. [6] In the notice of deficiency, respondent determined that petitioner was liable for the negligence addition to tax under section 6653(a) for its failure to report its investment credit recapture. OPINION Issue 1: Investment Credit
We must first decide whether the air conditioning units installed by petitioner in its Phoenix stores are section 38 property. Respondent contends that the air conditioning units are structural components of the buildings in which they were installed and, therefore, do not qualify as section 38 property. Petitioner, on the other hand, maintains that the air conditioners constitute section 38 property because they are not structural components of such buildings. According to petitioner, the air conditioners should *465 not be considered structural components because they were readily removable and could be reused. Furthermore, petitioner argues that the air conditioners are within the exception to the definition of the term "structural components" set forth in section 1.48-1(e)(2), Income Tax Regs., because they were installed solely to meet temperature and humidity requirements essential to the operation of its business. For the reasons set forth below, we hold for respondent. Section 48 defines the term "section 38 property," in part, as follows: Section 48. DEFINITIONS: SPECIAL RULES. (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) tangible personal property, or (B) other tangible property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction * * *.[Emphasis added.] [7]
*466 Pursuant to section 38(b), respondent, in section 1.48-1(e)(2), Income Tax Regs., defined the term "structural components" as follows: (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts * * * and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial *467 degree, areas where such temperature or humidity requirements are not essential * * * [Emphasis added.] We have held that the above quoted regulation represents an accurate interpretation of Congressional intent with respect to the treatment of heating and air conditioning equipment and accordingly determined that the regulation must be accepted as having the full force and effect of law. Fort Walton Square, Inc. v. Commissioner,54 T.C. 653 (1970); Samis v. Commissioner,76 T.C. 609, 619 (1981). In Fort Walton Square, this Court found that roof-type air conditioning and heating units similar to those installed by petitioner were part of a central air conditioning and heating system and constituted "structural components" of the building within that meaning of section 1.48-1(e)(2), Income Tax Regs. See also Kramertown Co. v. Commissioner,488 F. 2d 728 (5th Cir. 1974), affg. a Memorandum Opinion of this Court. Although petitioner has attempted to distinguish Fort Walton Square from the instant case, we are unable to do so. We believe that our reasoning as expressed in that case is equally *468 applicable herein. Petitioner maintains that the air conditioning units that it installed in its stores did not constitute part of a central air conditioning system, but simply "individual units." We view this as an unfortunate exercise in semantics. It is clear that the one or two units that petitioner installed on the roofs of its stores provided a source of cool air for the entire store and this is all that is necessary. As aptly stated in Rev. Rul. 67-359, [8]1967-2 C.B. 10: The term "central air-conditioning or heating system" is not restricted to mean that an entire building, irrespective of shape or size, must be air-conditioned or heated by one unit of equipment which is in a specific location within the building. The term also includes any air conditioning or heating or combination system which consists of two or more units, having the accessory ducts, connections and other equipment necessary to make the system functional, regardless of where located (whether in, on, or adjacent to the *469 building), or the manner of attachment. During periods of high humidity, the air conditioning units installed by petitioner were used to cool the building, while the evaporative coolers were used to cool the building when the humidity was low enough to allow them to operate efficiently. Together the preexisting evaporative coolers and the air conditioning units provided petitioner's Phoenix stores with a central air conditioning system. In contending that its air conditioning units are not structural components of the buildings in which they were installed, petitioner has argued that these units were easily removable. Furthermore, petitioner has asserted that the removal of the units prior to the expiration of their useful life and their reuse elsewhere was likely because petitioner leased most of its Phoenix stores and pursuant to those leases the air conditioning units remained its property. These allegations, however, are not supported by the record. There is nothing in the record that establishes the ease with which the air conditioning units could be removed, nor does it appear that the units were more readily removable than those in Fort Walton Square. Petitioner *470 also failed to prove that it was indeed likely that the air conditioners would be removed and reused. There is no evidence in the record with respect to the unexpired term of any of petitioner's leases or the exact useful life of the air conditioning units. In sum, petitioner's arguments consist wholly of unproven allegations of fact. Furthermore, petitioner's position is clearly contrary to Rev. Rul. 67-359, supra, a ruling which we followed in Fort Walton Square where we found it consistent with Congressional intent. The facts of that ruling are strikingly similar to those of the instant case. There the taxpayer, as lessee of a building used in his business, purchased air conditioning units to cool the leased premises for the comfort of the occupants. The owner of the building had agreed to install the air conditioning units. Under the lease, the units remained the property of the taxpayer who retained an unrestricted right of removal. Installation of the units required roof openings for insertion of the ducts from the units to the room ceilings below. The ruling determined that the classification of the units as "structural components" was not affected *471 by either the fact that the taxpayer retained title to the units under the lease or the fact that the units could be removed without material damage to them or the building. Petitioner has not attempted to distinguish this ruling, but has simply levelled an unpersuasive attack upon its reasoning.We are convinced, however, that our opinion in Fort Walton Square was correct and we shall continue to follow Rev. Rul. 67-359, supra.
Finally, petitioner argues that the air conditioning units are not structural components of the building because they were installed to meet temperature or humidity requirements essential to the operation of its business and, terefore, fall within the exception set forth in section 1.48-1(e)(2), Income Tax Regs. The exception relied on by petitioner provides that the term "structural components" does not include machinery installed solely "to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs." According to petitioner, the air conditioning units it installed fall wihin this exception because they were needed to prevent *472 the spoilage of foodstuffs it kept on its shelves and to eliminate hazardous conditions. Nevertheless, it is clear that this exception is inapplicable to the instant case. First, the air conditioning units were not essential to the operation of any machinery or the processing of materials or foodstuffs. Petitioner did not process foodstuffs, but simply marketed them. Second, the record indicates that the problems caused by the evaporative coolers during high humidity periods could have been eliminated by simply not using the coolers, but that such a course of action would have placed petitioner at a competitive disadvantage.Consequently, we believe that a substantial reason for the installation of the air conditioning units was to provide for the comfort of petitioner's customers, a purpose that is outside the scope of the regulatory exception relied upon by petitioner. In conclusion, we hold that the air conditioning units installed by petitioner constitute structural components of the building and, therefore, do not qualify as section 38 property. We next consider whether the addition that petitioner built onto its ice plant (i.e., the cold storage room) constitutes section *473 38 property. Petitioner maintains that the cold storage room constitutes "other tangible property" used as an integral part of manufacturing or production under section 48(a)(1)(B)(i) and, therefore, qualifies as section 38 property. It is petitioner's position that the cold storage room is essentially an item of machinery or equipment under section 1.48-1(e)(1), Income Tax Regs., because it is necessary to store the ice in the cold storage room for 24 hours after it is made in order to complete the manufacturing process. Respondent, on the other hand, maintains that petitioner has failed to prove that the cold storage room was used as an integral part of the manufacturing process and is essentially an item of machinery or equipment rather than a building. On the record before us, we must agree with respondent. Section 1.48-1(e)(1), Income Tax Regs., defines the term "buildings" as follows: (e) Definition of building and structural components. (1) Buildings and structural components thereof do not qualify as section 38 property. *474 The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide *475 for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. [Emphasis added.] This regulation has been construed as establishing a function or use test for determining whether a given structure is section 38 property. Valmont Industries, Inc. v. Commissioner,73 T.C. 1059 (1980); Lesher v. Commissioner,73 T.C. 340 (1979), affd. 638 F. 2d 64 (8th Cir. 1981); Thirup v. Commissioner,508 F. 2d 915 (9th Cir. 1974), revg. 59 T.C. 122 (1972). Petitioner asserts that the cold storage room functions essentially as an item of machinery or equipment because newly manufactured ice must be placed in cold storage for 24 hours to complete the manufacturing process. According to petitioner, the ice produced by the ice-making machines is "soft" and "wet" and must be stored and frozen for at least 24 hours before it is *476 marketable. The burden of proving this contention is upon petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure. Nevertheless, the only evidence that petitioner offered to support its position was the unconvincing testimony of its ice plant manager. Although the plant manager indicated that the ice needed to be placed in cold storage for 24 hours in order to harden, he also testified that petitioner does not employ any quality control procedures to insure that newly manufactured ice remains in cold storage for a minimum of 24 hours prior to shipment. Moreover, the record indicates that petitioner's ice plant manager never mentioned the purported use of the cold storage room in the manufacturing process when he gave a tour of the ice plant to a valuation engineer employed by respondent during which the engineer specifically asked him to explain the ice-making process. Instead, he told the engineer that the cold storage room was used to store the ice in a frozen state until it was shipped. Section 1.48-1(d)(4), Income Tax Regs., states that "[p]roperty *477 is used as an integral part of one of the specified activities [under section 48(a)(1)(B)(i)] if it is used directly in the activity and is essential to the completeness of the activity." On the record before us, petitioner has simply failed to prove that it was necessary to place the ice in cold storage for 24 hours in order to complete the manufacturing process. Petitioner has not offered a satisfactory explanation for its lack of any procedures to insure that the ice remained in cold storage for 24 hours. Such procedures would appear to be necessary if cold storage of the ice for a 24-hour period was an essential part of the manufacturing process. Furthermore, since the record clearly shows that the cold storage room functioned to provide storage space in addition to that available in the original ice plant, we are even less inclined to accept the meager evidence that petitioner has presented to establish that the cold storage room also functioned as an integral part of the manufacturing process. Accordingly, we must sustain respondent's determination that the cold storage room does not qualify as section 38 property. Issue 2: section 6653(a) Addition to Tax
Due to petitioner's *478 failure to report the recapture of investment credits for the year in issue, respondent imposed the addition to tax for negligence under section 6653(a). Petitioner maintains that respondent erred in imposing the negligence addition to tax because such failure was a non-negligent oversight. The burden of proving that the addition to tax is erroneous rests upon petitioner. Enoch v. Commissioner,57 T.C. 781, 802 (1972). Petitioner, however, has failed to offer any evidence to rebut respondent's determination. Furthermore, petitioner's failure to report the recapture of investment credits for its two preceding taxable years and its consent to respondent's determinations with respect thereto prior to the filing of its return for the year in issue (where there is no evidence that petitioner disagreed with such determinations and executed the consents as part of a settlement which included other issues) provides support for respondent's imposition of the addition to tax for negligence. Accordingly, we hold for respondent. To reflect the foregoing, Decision will be *479 entered for the respondent.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue.↩
2. The Phoenix stores were heated by separate heating units attached to the interior of each store.↩
3. The total cost of the air conditioning units installed by petitioner was $ 968,073. The air conditioning units constitute depreciable property with a useful life of seven years or more.↩
4. In addition, on the corner of this structure petitioner constructed a two-story building which was approximately 30 feet by 30 feet to house two new ice making machines.↩
5. The structural cost of the cold storage room exclusive of the cost of the refrigeration units attached to the walls was $ 126,961. The cold storage room constitutes depreciable property with a useful life of seven years or more.↩
6. Petitioner has conceded the correctness of this determination.↩
7. Sec. 301(d)(1), Energy Tax Act of 1978, Pub. L. 95-618, 92 Stat. 3199, 1978-3 C.B. (Vol. 2) 25, excluded "an air conditioning or heating unit" placed in service after September 30, 1978, from the definition of "tangible personal property" under sec. 48(a)(1)(A). This exclusion is only intended to apply to portable air conditioners and portable space heaters. S. Rept. No. 95-1324, 1978-3 C.B. (Vol. 2) 309, 339.↩
8. In Fort Walton Square, Inc. v. Commissioner,54 T.C. 653↩ (1970), we found that this revenue ruling accurately reflected Congressional intent.