WESTROADS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9444–76.     Filed February 13, 1978.

---

*Robert R. Veach,* for the petitioner.
*Ronald M. Frykberg,* for the respondent.

QUEALY, *Judge:* This proceeding involves the redetermination of a deficiency in income tax of petitioner for the taxable year ended January 31, 1973, in the amount of $53,995. As a result of agreement by the parties, the sole question remaining for decision is whether the cost of certain electrical generating equipment put into service by the petitioner in a regional shopping center, known as Westroads Shopping Center, qualifies as an investment in depreciable property under section 38[1] on account of which a credit is allowable under subpart B.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The petitioner is a corporation organized under the laws of the State of Nebraska, with its principal office at the time the petition was filed in Ralston, Nebr. Petitioner's income tax returns, Forms 1120, for its fiscal years ended January 31, 1969, 1970, and 1971, were filed with the Internal Revenue Service Center at Kansas City, Mo. Petitioner's returns for its taxable years ended January 31, 1972 and 1973, were filed with the Internal Revenue Service Center at Ogden, Utah.

Petitioner, at all times relevant, was the owner and operator of a regional shopping center known as Westroads Shopping Center, located in Omaha, Nebr.

In the construction of its shopping center, petitioner provided for what was designated as a "total energy system," consisting of a combination of heating, air conditioning, and electrical generating equipment. The electrical generating equipment was installed as a result of engineering studies on the assumption, which subsequently proved to be correct, that the petitioner could generate and sell electrical energy to the occupants of the shopping center at the same rates as the public utility on a profitable basis by utilizing the waste heat from the electrical generating equipment to provide an additional source of energy

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

for the heating and cooling equipment. The heat from the electrical generating equipment, which would otherwise be dissipated, was to be converted through heat exchangers as a source of power for the heating and cooling equipment.

In accordance with this plan, during the fiscal year ended January 31, 1969, petitioner installed a conventional heating, ventilating, and air conditioning system at a cost of $1,671,245.69. No investment credit was claimed or is claimed by petitioner on said assets. Petitioner also installed a conventional metered electrical distribution system to the rented spaces at a cost of $434,180.50 on which it claimed no investment credit.

Finally, in order to generate electricity for sale to the tenants of the shopping center, petitioner installed an electrical generating system which was powered by three dual fuel engines of 1770 horsepower each. Three 1250 kilowatt generators were attached to and driven by the engines. The cost of the three engine generator units was $494,500. Directly related costs of switchgear equipment, controls, generator bases, steel frames, hoist, installation, and interest charges totaled an additional $300,048.40. Petitioner claimed and the respondent allowed depreciation on this generating equipment on a 20-year useful life basis.

The electrical generating, air conditioning, and heating equipment are located together in the basement or lower level of the shopping center building, underneath some of the retail areas being served. The engine generator units are mounted upon specially constructed steel frames connected to springs which are bolted to a separate concrete foundation base.

Waste heat from the dual fuel generator engines, including the exhaust heat, and heat from the water and oil used in the cooling system of those engines, is converted by means of heat exchangers into an additional source of energy for the operation of the heating system and the evaporation system for the air conditioning equipment.

Electricity from the generating equipment is transmitted from the generators to a control panel by electrical cables which rest in a concrete pipe chase built into the floor and covered by a steel plate. The control panel is located in an elevated control room about 30 to 40 feet from the generators. Provision was made to switch over to the public utility lines in case of need. Electricity flows from the control panel by conduit to meter

centers and then throughout the building via petitioner's electrical distribution system. The transmission lines to various tenants of the shopping center are located in ceilings, below floors, and possibly within walls of the building.

In its fiscal year ended January 31, 1973, petitioner installed, as a standby, a used 1000 kilowatt engine-powered generator. The total installed cost of the unit was $88,947.11. Depreciation was claimed by petitioner on said unit based upon an 8-year life and was allowed as such by the respondent.

Petitioner generates electricity for all tenants of the center (the number of tenants varies from time to time, but approximates 150) except two large department store tenants. These two tenants receive their electrical power directly from a public utility. Two other occupants of the center also receive their electrical power directly from a public utility, as do the malls and other common areas throughout the center.

Tenants were billed each month separately for electricity and for heating, ventilating, and air conditioning (HVAC). Tenants were billed for electricity based upon meter readings and for HVAC based upon a square foot rate. Charges for electricity were equivalent to the kilowatt hourly rates charged by the Omaha Public Power District. Petitioner derived income with respect to sales to tenants of both electricity and HVAC.

Petitioner realized income of $101,191.38 (without considering depreciation and various indirect costs and expenses) from the sale of electricity to tenants during the taxable year ended January 31, 1973. During the taxable year ended January 31, 1973, petitioner's income with respect to "charges for occupancy of shopping center and for services rendered to occupants" totaled $2,266,063. During the taxable year ended January 31, 1969, the year the three principal generators were placed in service, income from the sale of electricity was $64,566.40 of a total income of $1,324,797.44.

Petitioner did not sell electricity to anyone who was not a tenant of the shopping center. Petitioner's activities in furnishing electricity to tenants were not subject to licensing or regulation by any public or political body.

In its income tax return for the taxable year ended January 31, 1973, petitioner claimed an investment credit for said year in the amount of $12,295 and a carryover of unused investment credit of $66,138 ($65,422 from the taxable year ended January

31, 1969, plus $716 from the taxable year ended January 31, 1970).

In his statutory notice to petitioner for the taxable year ended January 31, 1973, respondent determined that the correct investment credit carryover from the taxable year ended January 31, 1969, was $10,175.51 and that the investment credit allowable for the taxable year ended January 31, 1973, was $6,896.04. The carryover of $716 from January 31, 1970, was determined to be allowable. Respondent's determination was based on the disallowance of any investment credit for the cost of the electrical generating equipment put into service in the taxable years ended January 31, 1969 and 1973.

## OPINION

Petitioner owns and operates a regional shopping center, constructed to its design in the fiscal year ended January 31, 1969, in Omaha, Nebr. In the design of the shopping center, petitioner determined that, in addition to the rentals, the profitability could be enhanced by the installation of electrical generating equipment, from which the waste energy (heat) could be used to supplement the energy required for providing heating and air conditioning services to the rented areas.

As designed and installed, the system consisted of three 1250 kilowatt engine generators with the requisite control panels which were connected into the electrical distribution lines serving the various rented spaces. Provision was also made to switch over to the incoming lines from the public utility in the event of a failure of the system. Certain larger stores and the public areas were likewise served by the public utility. The electrical service was charged on a kilowatt basis at the same rates charged by the public utility. The profitability of the system, however, resulted from being able to utilize the waste energy in the form of the exhaust heating and the heated water and oil used in the cooling of the engines. This otherwise wasted energy was converted by heat transfer coils to produce additional energy to power the heating and air conditioning system which had been installed to serve the rented spaces. Such systems could not be operated solely from the waste energy supply taken from the engine generators.

Petitioner claimed an investment credit under section 38 on account of the installed cost of the electrical generating

equipment and the control panels, up to the point where the output of the generators entered the electrical distribution system. The amount of such costs is not in dispute. Respondent has disallowed the investment credit, as claimed, on the ground that the electrical generating facilities are not tangible personal property and constitute a structural component of the building. Sec. 1.48–1(e)(2), Income Tax Regs. (1969). In our opinion, respondent's determination is in error.

For purposes of the investment credit, section 38 property is defined, in part, as follows:

SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *

Insofar as material to the issue herein, section 1.48–1(e)(2) of the regulations states:

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. * * *

Petitioner contends that the equipment in question qualifies as section 38 property both because it is "tangible personal property" within the meaning of section 48(a)(1)(A) and other tangible property, not a structural component of the buildings, used for the furnishing of the electrical energy under section 48(a)(1)(B). A finding with respect to either alternative would suffice to sustain petitioner's claim.

With respect to the qualification of the installation as "tangible personal property," the dual fuel engines which serve as a power source for the electrical generators and such generators would, under the common understanding of that

term, constitute "tangible personal property." Other components of the installation might not meet that definition.

On the other hand, it is clear that the installation itself, including the control panels, was tangible property used as an integral part of supplying electric energy and was not a structural component of any building.

Instead of purchasing and distributing electrical energy supplied by the public utility, petitioner sought to enhance the profitability of its operation by generating such energy to be fed into the electrical distribution system. While the resulting income did not constitute a large percentage of the total income from the operation of the shopping center, the amount was not insignificant. Petitioner's decision to install the system was not motivated by any reasons of convenience, or lack of the availability of public power, but to make a profit.

Cases cited by the respondent in his brief are readily distinguishable. *Fort Walton Square, Inc. v. Commissioner,* 54 T.C. 653 (1970); and *Kramertown Co. v. Commissioner,* 488 F.2d 728 (5th Cir. 1974), dealt with the qualification for the investment credit of the air conditioning and heating system itself. It is undisputed that the petitioner in this case does not claim an investment credit on the cost of such equipment, which totals $1,671,245.69. We are here concerned solely with the source of the energy used to power that equipment.

Other cases, such as *Evans v. Commissioner,* 48 T.C. 704 (1967), dealt with the distribution systems in a mobile home park. In that case, the taxpayer purchased the electrical energy from the public utility and in turn resold it to its tenants. In the present case, petitioner is not claiming an investment tax credit on the electrical distribution system which was installed at a cost of $434,180.50. Finally, in *Hayden Island, Inc. v. United States,* 380 F. Supp. 96 (D. Ore. 1974), the taxpayer failed to prove that the sewage treatment plant was installed as a profitmaking activity. Proof of profitability was lacking.

In the case of the Westroads Shopping Center, it is clear that the sole purpose for the installation of the electrical generating equipment was to increase the profitability of the shopping center by the realization of income from the generation and sale of such electricity. Petitioner's trade or business included the production of electrical energy for sale. The generation of electricity for sale to the tenants is not the customary role of the

landlord in such cases. Electricity may be purchased from the public utility and resold through the distribution system installed in a shopping center, but the cost of that system is not here claimed as section 38 property.

The petitioner went beyond the distribution system, and after careful engineering studies, concluded that the profitability of its business would be enhanced by generating electricity for sale to its tenants. The fact that the waste heat from the generating system was used to supplement the energy required for air conditioning and heating is merely incidental. No one would install an electrical generating system in order to obtain waste energy to be used to heat a shopping center.

With respect to the original installation which was put into service during the taxable year ended January 31, 1969, it is clear that the installed cost constituted the cost of section 38 property used in the production of electrical energy for sale as a part of the trade or business of this petitioner. As such, the amount in question qualifies for the investment credit to be carried over from the taxable year to the taxable year before the Court. The standby electrical generating equipment put into service during the taxable year ended January 31, 1973, would also qualify as tangible personal property. See Rev. Rul 70–103, 1970–1 C.B. 6.

*Decision will be entered under Rule 155.*