314

DAVID S. GROW, JUDITH W. GROW, ROBERT G. WILSON, ROCHELLE R. WILSON, RAYMOND O. CHRISTENSEN, CICILY M. CHRISTENSEN, JERALD J. BERGERA, ANNE B. BERGERA, MAURICE K. ROSKELLEY, MARILYN M. ROSKELLEY, ROBERT H. NELSON, AND BARBARA K. NELSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GEORGE A. FRANCOM AND ARMANELL FRANCOM, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 20871–80, 23209–80.    Filed January 31, 1983.

*John R. Riley,* for the petitioners.
*Dan A. Lisonbee,* for the respondent.

KÖRNER, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Petitioners | Year | Deficiency |
|---|---|---|
| David S. and Judith W. Grow | 1973 | $99.00 |
|  | 1974 | 1,108.00 |
| Robert G. and Rochelle R. Wilson | 1975 | 2,237.00 |

*Hickman v. Commissioner,* T.C. Memo. 1972–208; cf. *Wyly v. Commissioner,* 662 F.2d 397 (5th Cir. 1981).

| | | |
|---|---|---|
| Raymond O. and Cicily M. Christensen ..... | 1972 | $483.00 |
| | 1975 | 3,682.00 |
| Jerald J. and Anne B. Bergera ............... | 1975 | 2,445.72 |
| Maurice K. and Marilyn M. Roskelley ...... | 1975 | 3,060.62 |
| Robert H. and Barbara K. Nelson ........... | 1975 | 6,038.30 |
| George A. and Armanell Francom ........... | 1975 | 7,299.00 |

By order of this Court, these cases were consolidated for purposes of trial, briefing, and opinion.

The ultimate issue presented for resolution is whether the petitioners are entitled to an investment tax credit under section 46[1] for the year 1975 with respect to all or any part of the water distribution and sewer disposal system used in the Majestic Oaks Mobile Home Park. In order to decide this issue, the Court must determine:

(1) Whether the water distribution and sewer disposal system qualifies initially as section 38 property under section 48(a);

(2) If these water and sewer facilities so qualify, whether they are new or used within the meaning of section 48(b) or (c); and

(3) If used property, whether any investment tax credit with respect thereto is barred under the provisions of section 48(c).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

For the years in issue, petitioners filed their income tax returns with the Internal Revenue Service Center in Ogden, Utah. During 1975, petitioners were either general or limited partners in The Oaks, Ltd. (hereinafter the partnership). All of the petitioners resided in the State of Utah at the time they filed their petitions in this Court.[2]

On October 1, 1975, the partnership was formed in accor-

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect for 1975, and all Rule references are to the Tax Court's Rules of Practice and Procedure, unless otherwise noted.

[2]Petitioners David and Judith Grow have received tentative refunds for tax years 1973 and 1974 due to claimed investment tax credit carrybacks from 1975. Petitioners Raymond and Cicily Christensen have also received tentative refunds for tax year 1972 due to claimed investment tax credit carrybacks from 1975. Taxable years 1972, 1973, and 1974 are involved in the present case only to the extent that these individual petitioners claimed these investment tax credit carrybacks.

dance with the requirements of Utah State law. On October 27, 1975, the partnership and petitioner George Francom purchased the Majestic Oaks Mobile Home Park (hereinafter Majestic Oaks), located near Salt Lake City, Utah, from M & H Investment, an unrelated party. The partnership acquired a 91.765-percent interest in Majestic Oaks, and Mr. Francom acquired an 8.235-percent interest. Mr. Francom also became a limited partner in the partnership.

At the time the partnership acquired Majestic Oaks, it was a completely new and mostly unoccupied mobile home park. Of the 398 mobile home sites, only 82 had been rented by M & H Investment at the time of acquisition. As of October 27, 1975, 316 of these spaces had never been used. M & H Investment commenced the onsite construction of Majestic Oaks in 1972. The construction of the water and sewer system was completed first, and prior to acquisition by the partnership, while the roads, concrete pads, and aprons surrounding the mobile home sites were completed thereafter, and prior to the close of 1975.

Water and sewer services in Majestic Oaks were provided by the partnership. The Taylorsville-Bennion Improvement District (hereinafter the Improvement District) a local governmental unit, would not deliver water and sewer services past Majestic Oaks' property line. Due to this fact, M & H Investment undertook to build and install a private water distribution and sewer disposal system within the park, which was acquired by the partnership as part of its purchase from M & H Investment, and which connects to the Improvement District system.

Before the partnership purchased Majestic Oaks, a careful analysis was undertaken to determine whether a profit could be made from both the mobile home park sites and from supplying water and sewer services to Majestic Oaks' tenants. In making this determination, the partnership consulted a professional management company. The partnership concluded that both the mobile home park and the water and sewer facilities would independently produce a profit. At the time of purchase, the partnership viewed the water and sewer facilities as a separate and potentially profitable business, and would not have acquired the water and sewer facilities if it had not believed that such business was viable.

As a part of the purchase agreement, the partnership

required M & H Investment to lease back Majestic Oaks until the number of occupants in the new park reached a certain level. Although the partnership acquired Majestic Oaks in October of 1975, it did not take over the management of the park until sometime in 1976.

Upon taking possession of the park, the partnership treated the water and sewage disposal system as a separate business. Any income received, or expenditure made, resulting from the furnishing of these services was segregated from like income or costs resulting from the other operations of the mobile home park, including an allocation of portions of such cash costs as taxes, postage, and management expense, but not including such non-cash items as deductible depreciation for tax purposes, or any unrealized appreciation in value of the water and sewer system. Separate books were kept to record the income and expenses of each segment of the enterprise.

The partnership retained a professional management company to attend to the day-to-day operations of both the mobile home park and the water and sewage disposal system. At the end of each month, the management company compiled a statement showing the profits and losses resulting from the operation of the water and sewage disposal facilities. This monthly statement was submitted and reviewed by the partnership. If the partnership had any question regarding this monthly report, the management company and a representative of the partnership would jointly review this document.

An evaluation was undertaken to determine the proper utility charge to bill residents of the mobile home park. Numerous factors were considered in setting this charge, including a comparision of the proposed charge with the fee paid for the same services in other comparable residential units. From the outset, the rate to be charged tenants for water and sewer services was intended to be sufficiently high in order to assure a profit for the partnership. Due to the large volume of water and sewage disposal services needed for the park, Majestic Oaks received wholesale rates from the Improvement District. Majestic Oaks did not pass these savings through to their customers, but rather charged the tenants retail rates, initially $12.50 per month per mobile home, slightly increased in later years.

Majestic Oaks did not install individual meters at every

trailer home. After study, the partnership concluded that the use of water and sewer facilities by the renters of mobile home spaces would be about the same, so that the cost of installation, reading, and maintenance of individual meters outweighed any benefit that would result from this equipment. The partnership therefore elected to bill each tenant a flat fee every month for water and sewer services. This charge was separate from the monthly mobile home site rental charge.

Majestic Oaks had a common area that included a swimming pool, clubhouse, and other recreational facilities, and the water and sewer system served these areas as well. The water and sewer expenses attributable to this common area were billed to the Majestic Oaks Mobile Home Park. Every month, Majestic Oaks issued a check to the "Majestic Oaks Water and Sewer Company" to cover these charges.[3]

Beginning with the year 1976, the first full year of operation of Majestic Oaks, and through 1981, the water and sewer operations showed a net profit, based upon the partnership's segregation of income and costs on a cash-flow basis. After straight-line depreciation, as claimed in the partnership return, a net profit was produced only in the year 1979. The following chart shows the amount of the gross income received by the partnership by furnishing these services, the cost to the partnership for receiving water and sewer services from the Improvement District, the amount of income remaining after the allocation of other identifiable costs, depreciation and net profit or loss:

| Year | Income from water and sewer services | Payments to Improvement District | Other costs allocated[4] | Net cash flow | Depreciation | Net income (loss) |
|------|------|------|------|------|------|------|
| 1976 | $9,036 | $3,529 | $4,448 | $1,059 | $22,807 | ($21,748) |
| 1977 | 26,097 | 21,234 | 3,871 | 992 | 22,807 | (21,815) |
| 1978 | 37,381 | 15,586 | 3,494 | 18,301 | 22,807 | (4,506) |
| 1979 | 55,699 | 22,477 | 4,721 | 28,501 | 22,807 | (5,694) |
| 1980 | 55,784 | 31,976 | 9,820 | 13,988 | 22,807 | (8,819) |
| 1981 | 71,695 | 37,086 | 17,836 | 16,773 | 22,807 | (6,034) |

[3]Although the sewer and water system was treated as an independent enterprise for billing and accounting purposes, it was not a separate legal entity but simply a division of the overall partnership operation.

[4]Including, as appropriate, management and lease costs, maintenance, postage, and taxes.

In accordance with the original construction costs, the partnership allocated a portion of the total purchase price of Majestic Oaks to the water and sewer system. On its return for 1975, the partnership claimed an investment tax credit on this water and sewer system, with a cost of $342,114 and a useful life of 7 or more years. For investment tax credit purposes, the system was treated as new section 38 property. Each of the petitioners, as partners in Majestic Oaks, claimed his distributive share of this investment tax credit on his joint individual income tax return for 1975. In the notices of deficiency sent to each of the individual petitioners, the respondent determined that the partnership was not entitled to claim an investment tax credit on this water and sewer distribution system since it did not qualify as section 38 property.

The furnishing of water and sewer services to Majestic Oaks and its tenants was operated as a separate trade or business by the partnership with the good-faith objective of making a profit, considering both current operations and the possibilities of profit on resale.[5]

## OPINION

The problem for resolution is whether petitioners can claim a section 38 investment tax credit on the water and sewer system installed at the Majestic Oaks Mobile Home Park. In order to resolve this ultimate issue, three determinations must be made. First, we must decide whether the water and sewer system qualifies in the first instance as section 38 property. Second, assuming that our first inquiry is answered in the affirmative, we must then decide whether this property is new or used (or some of each) within the meaning of section 48. Third, if all or any portion is used property, we must

---

[5]Petitioner's witness, an officer of one of the general partners of the partnership and intimate with the operations of the partnership, testified as to one or more approaches to the partnership by unrelated parties, indicating an interest in purchasing the water and sewer operation at prices higher than the partnership's cost. While this testimony was insufficient to support any finding herein as to any specific offers in specific amounts, we are convinced that the partnership sincerely believed that there was an appreciation potential in the water and sewer system which it might realize a profit in the future, and we do not find such belief to be inherently incredible or unreasonable in the circumstances.

determine whether, under the facts of this case, an investment tax credit is barred by reason of the provisions of section 48(c).

Respondent argues initially that the water and sewer system purchased by petitioners does not qualify as section 38 property because it is not tangible personal property or other tangible property under section 48(a)(1)(A) and section 48(a)(1)(B), respectively. Alternatively, respondent argues that even if the water and sewer system would qualify as section 38 property under section 48(a)(1), it is used property in petitioners' hands, and subject to the limitations of section 48(c). Petitioners do not contend that the system is tangible personal property but assert that the sewer and water system is "other tangible property" under section 48(a)(1)(B), is used as an integral part of furnishing utility services to customers at Majestic Oaks, and is new section 38 property. The parties are not in disagreement as to the cost or useful life claimed by petitioners.

## I

### Section 38 Property

Section 38 generally provides that there shall be a credit against the income tax for investments made in certain property, as defined and limited in sections 46 through 50. Petitioners claim that this water and sewer system qualifies under section 48(a)(1)(B), which provides, in relevant part, that section 38 property includes—

(B) other tangible property (not including a building and its structural components) but only if such property—
(i) is used as an integral part of * * * furnishing * * * water, or sewage disposal services * * *

The taxpayer, however, must be in the trade or business of providing these services before this property will qualify as section 38 property. Sec. 1.48–1(a), Income Tax Regs.

There appears to be no serious disagreement between the parties that the water and sewer system qualifies as other tangible property. The real dispute is over the question whether the partnership was in the trade or business of providing these utility services as a separate business.

Respondent argues that the petitioners have not established that they were in the trade or business of furnishing water or

sewer services. Respondent claims that the providing of water and sewer services is only incidental to petitioners' business of running a mobile home park. Petitioners, on the other hand, contend that they are in two separate businesses; that is, they are in the business of providing mobile home sites for rent, and in the business of providing water and sewer services to Majestic Oaks' tenants, and to the park, itself.

On several occasions, this Court has been called upon to determine whether the providing of utility services is merely incidental to a taxpayer's primary business.[6] Other courts have also been called upon to make this determination.[7] The issue usually arises in situations where the taxpayer is engaged in a business that benefits directly from the furnishing of these utility services. Whether a taxpayer is engaged in a separate trade or business of furnishing utility services is an essential factor in determining whether the taxpayer's property qualifies as section 38 property under section 48(a)(1)(B).

In *Evans v. Commissioner*, 48 T.C. 704, 709 (1967), affd. 413 F.2d 1047 (9th Cir. 1969), this Court established the following standard for determining whether a taxpayer is in the separate trade or business of furnishing utilities:

> in order to find that these activities constitute another trade or business of the petitioners, it would have to be shown that these activities earned a substantial amount of income, separate from the trailer park rental fees, and that there was a good faith intention of making a profit from them in and of themselves. * * *

We believe that the petitioners have satisfied this two-part test.

First, it is evident that a substantial amount of partnership income (net before depreciation) was derived from furnishing these utility services to Majestic Oaks' tenants. As shown by our findings herein, carefully segregated books and records for the utility service operation were maintained, and, in addition

---

[6]See *Evans v. Commissioner*, 48 T.C. 704 (1967), affd. 413 F.2d 1047 (9th Cir. 1969); *Graybeal v. Commissioner*, T.C. Memo. 1979-506; *Westroads, Inc. v. Commissioner*, 69 T.C. 682 (1978).

[7]See *Tejas Properties, Inc. v. United States*, an unreported case (E.D. Tex. 1970, 25 AFTR 2d 70-720; 70-1 USTC par. 9240); *Johnston v. United States*, an unreported case (D. Mont. 1979, 45 AFTR 2d 80-948; 80-1 USTC par. 9199); *Hayden Island, Inc. v. United States*, 380 F. Supp. 96 (D. Ore. 1974).

to the direct costs incurred in buying the services from the Improvement District, the partnership allocated appropriate portions of its general and indirect cash costs to the utility business.[8] As operated by the partnership, the utility business showed positive cash flow from the beginning, small at first, but increasing in later years, as the park filled up with tenants and upward adjustments in the monthly charges were made.

Respondent argues that the "substantial income" requirement of *Evans v. Commissioner, supra,* is not met, since, says respondent, a net loss for 5 of the 6 years was produced after deducting depreciation on the water and sewer system. We think, however, that looking only at net taxable income (after depreciation) is an unduly narrow and therefore unreliable standard to apply in this case in testing for "substantial income" for purposes of section 48. Depending upon the depreciation methods employed by the taxpayer and permitted by the Code (see secs. 167, 168; *Brannen v. Commissioner,* 78 T.C. 471 (1982)), widely different results can be produced in a given situation so far as *net taxable income* is concerned, which can be quite misleading, looked at alone, as to the inherent economic viability of an enterprise. Granted, that depreciation does occur and that it is proper to take it into account in the present situation, evenly distributed over the estimated life of the asset, i.e., on a straight-line basis (see *Tejas Properties, Inc. v. United States,* an unreported case (E.D. Tex. 1970, 25 AFTR 2d 70–720, 70–1 USTC par. 9240)), it is also appropriate to test for "substantial income" by applying a pragmatic and businessman's standard; viz, whether the allegedly separate trade or business is structured so as to stand on its own feet financially and yield a reasonably predictable positive cash flow (see *Westroads, Inc. v. Commissioner,* 69 T.C. 682 (1978); *Scull v. Commissioner,* T.C. Memo. 1983–33).

This is particularly true in the case of a newly organized business, as here. Most new businesses just commencing can reasonably expect that small net profits and even losses will be realized in the early years of the venture, before the enterprise has become established and built up to its full potential, and

---

[8]On brief, respondent grumbles that the partnership's allocation of indirect expenses may have been inadequate and incomplete, but respondent has provided us with no basis in this record to make such a finding.

the *net taxable* results can be further distorted when methods of accelerated depreciation are used, producing large depreciation deductions in years when gross income is likely to be the least. Under the facts of this case, therefore, we think that "substantial income" within the meaning of *Evans v. Commissioner, supra,* has been shown (cf. *Westroads, Inc. v. Commissioner, supra; Graybeal v. Commissioner,* T.C. Memo. 1979–506), emphasizing that our approach is limited to the section 48 qualification requirement presented herein, and to which *Evans* was addressed, without any implications as to the requirements which taxpayers may have to meet under other sections of the Code, e.g., section 183, where the relationship of depreciation to income may be a relevant and material consideration.

Second, we believe it is clear that petitioners had a good-faith objective of making a profit from providing these services. Prior to the purchase of Majestic Oaks, the partnership undertook a careful analysis to determine whether a substantial profit could be made from providing water and sewer services. The record indicates that Majestic Oaks' tenants were not provided these services at cost. Rather, the Improvement District charged Majestic Oaks wholesale rates, while the partnership charged Majestic Oaks' tenants retail rates. The partnership kept separate books to record the income and costs associated with providing utility services and the income and costs associated with renting mobile home sites.

Separate utility bills were sent monthly to Majestic Oaks' tenants. The professional management company that attended to the day-to-day operation of both the mobile home park and the water and sewer facilities, submitted a monthly report to the partnership showing the income and costs associated with the water and sewer system. These monthly statements were submitted and reviewed by the partnership. The fact that the partnership took careful steps to segregate the operation of the mobile home park from the operation of the water and sewer facilities indicates the intention of the partnership to make a profit from offering these services. Cf. *Johnston v. United States,* an unreported case (D. Mont. 1979, 45 AFTR 2d 80–948, 80–1 USTC par. 9199); *Hayden Island, Inc. v. United States,* 380 F. Supp. 96 (D. Ore. 1974).

Our determination in this matter is not dependent upon whether these water and sewer services actually resulted in a profit. In determining whether an activity is entered into with the objective of making a profit, it is not fatal that the chance of realizing a profit is poor, or even remote. For purposes of section 48, we think the "good faith intention of making a profit" is the same as it is for purposes of section 183, and that the test is satisfied when "the taxpayer entered into the activity * * * with the actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982); *Mercer v. Commissioner*, 376 F.2d 708 (9th Cir. 1967); sec. 1.183–2(a), Income Tax Regs.

Obviously, evidence of large and continuing losses is relevant and material in determining whether such good-faith intention exists (*Golanty v. Commissioner*, 72 T.C. 411 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); *Scull v. Commissioner, supra*). The facts in the instant case, however, do not compel us to find against petitioners on this point. Unlike *Brannen v. Commissioner, supra*, where the large losses (generated mostly by depreciation), compared to the gross income, suggested an intention to realize tax deductions rather than profit from the enterprise, the depreciation claimed by petitioners herein was on the most conservative basis, viz, straight line, and was not excessive in relation to the gross income from the water and sewer system.

In *Golanty v. Commissioner* and *Scull v. Commissioner, supra*, the record showed that the taxpayers in those cases not only had consistent net losses after depreciation, but also had consistent net losses even before depreciation, i.e., negative cash flow. In the instant case, petitioners had consistent *positive* cash flow, and had a net profit, after depreciation, in one of the 6 years following their acquisition of the new mobile home park. We do not think that such a record precludes our finding that petitioners here had a good-faith objective of making a profit from the current operations of the water and sewer system. Additionally, and importantly, petitioners believed that the system was appreciating in value and that there was a separate profit potential in the event of a sale of the system. On this record, such a belief was not inherently incredible, and is a factor properly to be considered (sec. 1.183–

2(b)(4), Income Tax Regs.), whether or not it turns out to be true in the future.

In this case, we see no reason why the furnishing of water and sewer services by the partnership should not be viewed as a separate trade or business. Subject to what follows hereinafter, therefore, we hold that this water and sewer system is "section 38 property" within the meaning of section 48(a)(1)(B).

## II

### New or Used Section 38 Property

Although the water and sewer facilities initially qualify as section 38 property, the amount of the investment tax credit available to the taxpayer is dependent, inter alia, upon whether they are new or used within the meaning of section 48(b) and (c). The facts in this case make such determination difficult. At the time of purchase, 82 of a total 398 mobile home sites in Majestic Oaks were rented. The remaining 316 spaces had never been occupied, and in some cases were not completed. Thus, that portion of the system serving these unused mobile home sites had never been used.

The controversy between the parties is: should this system be treated as an indivisible whole, whereby the use of any part of the system would render the whole system "used"; or should this system be considered as "new" section 38 property, since the largest portion had never been used at the time the partnership purchased Majestic Oaks? Respondent argues for the former, while petitioners, although principally arguing that the whole system should be considered as "new" in their hands, ask us to consider the possibility of a division between "new" and "used."

"New" section 38 property means, inter alia, section 38 property, acquired after December 31, 1961, whose original use commences with the taxpayer, and "used" section 38 property is that which is not "new." Sections 48(b)(2) and 48(c)(1). "Original use" is defined in section 1.48–2(b)(7), Income Tax Regs., as "the first use to which the property is put, whether or not such use corresponds to the use of such property by the taxpayer." The utility system here in question was built and installed by M & H Investment. Since 82 of the 398 mobile home sites were rented at the time the partnership purchased

Majestic Oaks, respondent reasons that the utility system was used at the time petitioners purchased the property. Respondent therefore argues that if the water and sewer system qualifies as section 38 property, the whole system must be used property as that term is defined in section 48(c).

Petitioners disagree, and claim that since the system separately services 398 mobile home sites, it should not be treated as an integrated whole. Petitioners contend that it would be contrary to reason to determine that the whole system was "used" property, since the great majority of the mobile home sites were new, and had never been rented, and the corresponding water and sewer facilities never used. Petitioner thus argues that a substantial part of the whole system should be treated as new, if not the entire system.

We think that the treatment of section 38 property as either new or used is not an all-or-nothing proposition. We are not required by the statute to ignore established facts when it is shown that, as of a given time, use of a portion of certain section 38 property has commenced but use of another portion has not. The applicable sections of the Code (sections 46 and 48) and the regulations thereunder are flexible enough to permit, even require, that section 38 property be split, both for purposes of determining the correct year in which to claim the credit, as well as for purposes of fixing the amount of credit by determining the status of the property as new or used, where the facts require it.

In the instant case, the facts are that the construction of the water and sewer system was complete in 1975. It was thus "placed in service" in that year within the meaning of section 46 and section 1.46–3(d) of the regulations, and we do not understand the parties to be in disagreement about this. However, at the time the partnership acquired the property, the facts are also clear that only a small portion of the new system had been put to use by M & H Investment in providing services to tenants. The great majority of the system was still unused, apparently because the sites themselves were not yet ready to receive tenants. The remaining work in preparing the parking places, roads and approaches having been completed after the acquisition of the mobile home park by the partnership and prior to the end of 1975, these previously unavailable sites, together with their water and sewer connections, were

then put in use by the partnership by the end of that year, regardless of the fact that some spaces may not then have actually been rented. *S.M.C. Corp. v. United States*, an unreported case (E.D. Tenn. 1980, 46 AFTR 2d 80–5827, 80–2 USTC par. 9642), affd. per curiam 675 F.2d 113 (6th Cir. 1982). Such use was the "original use" of this part of the system within the meaning of section 48(b)(2). On the other hand, the portion of the system serving the 82 mobile home sites already rented out by M & H Investment at the time of the partnership's purchase was already in use and clearly was "used" property in the partnership's hands. Sec. 48(c)(1).

Both this Court and respondent have recognized that, in appropriate cases, a single section 38 property can and should be divided between new and used elements. Sec. 1.48–2(c), example (5), Income Tax Regs.; cf. *Kansas City Southern Railway Co. v. Commissioner*, 76 T.C. 1067 (1981), on appeal (8th Cir., Oct. 25, 1982).

Having concluded that the instant property must be divided between new and used elements for investment tax credit purposes, we must decide how to do it. The water and sewer systems (each separately) may be thought of as a tree, with a trunk and numerous branches. In the fresh water system, the water enters the trunk from the Improvement District and passes up the trunk and into the various larger branches and smaller branches until it is delivered to the tip of the twig and a mobile home owner. The parallel sewer system works exactly in reverse, transporting waste from the mobile home owner back through the branches and trunk to the Improvement District. With negligible variation, the various mobile home units were about the same size and the difference in their estimated use was so minor that the partnership concluded that it was appropriate to impose a uniform flat charge per unit per month.

In these circumstances, we think that a fair, practical, and reasonably accurate method of allocation can be made here by dividing the property between "used" and "new" in the same proportion that the units rented out prior to the partnership's acquisition of the property bear to the total number of mobile home sites. Such a division proceeds on the assumption, which we find reasonable, that the use of water and sewer by each mobile home unit is approximately equal, and that, as to the

common elements, the use was also proportionate to the occupancy of home sites. We can think of no better method to make the necessary allocation here, and neither party has suggested one.[9] Accordingly, we conclude and hold that 82/398 of the water and sewer system was used section 38 property, and 316/398 was new section 38 property in the hands of the partnership in 1975, subject, however, to a further complication with respect to the used portion, which we next address.

## III

### Qualification of the Used Section 38 Property for Investment Tax Credit

Finally, we must consider whether the portion of the water and sewer system which we have held to be "used" property within the meaning of section 48 is disqualified, as a basis for claiming investment tax credit, under the facts of this case.

At the time the partnership acquired the Majestic Oaks property on October 27, 1975 (including the water and sewer system), the seller, M & H Investment, had already rented out 82 out of the total of 398 mobile home spaces, together with the use of the corresponding water and sewer facilities. As we have held, this portion of the water and sewer system was therefore already in use when acquired by the partnership. As part of the purchase and sale agreement, however, M & H Investment leased back the entire property from the partnership until an agreed level of occupancy was reached, and this event did not occur until sometime in 1976.

The relevant portion of section 48(c) provides as follows:

SEC. 48(c). USED SECTION 38 PROPERTY.—

(1) IN GENERAL.—For purposes of this subpart, the term "used section 38 property" means section 38 property acquired by purchase after December 31, 1961, which is not new section 38 property. Property shall not be treated as "used section 38 property" if, after its acquisition by the taxpayer, it is used by a person who used such property before such acquisition * * *

---

[9]Conceding that our method is not a model of mathematical exactitude, we nevertheless are comforted by the well-established principle that the investment tax credit provisions of the Code are to be liberally construed. *Pacific Far East Line, Inc. v. United States*, 211 Ct. Cl. 76, 544 F.2d 478, 484 (1976); *Minot Federal S & L Association v. United States*, 435 F.2d 1368, 1372 (8th Cir. 1970).

Section 1.48–3(a)(2)(i) of respondent's Income Tax Regulations further provides:

Property shall not qualify as used section 38 property if, after its acquisition by the taxpayer, it is used by (*a*) a person who used such property before such acquisition * * * . Thus, for example, if property is used by a person and is later sold by him under a sale and lease-back arrangement, such property in the hands of the purchaser-lessor is not used section 38 property because the property, after its acquisition, is being used by the same person who used it before its acquisition. * * *

The portion of the water and sewer system applicable to the 82 mobile home spaces previously rented out by M & H Investment, which we have held to be "used section 38 property," is thus clearly within the prohibition of the second sentence of the above-quoted portion of section 48(c)(1), and we must hold that the partnership is entitled to no investment credit with respect thereto.[10]

With respect to the specific point involved here, petitioners complain that respondent first called attention to the second sentence of section 48(c)(1) in his reply brief; that this constituted the raising of a new issue by respondent in his reply brief which was not raised at trial nor on opening brief; that this new issue caught petitioners completely by surprise and should not, therefore, be considered by the Court. We find petitioners' objections without merit.

Ordinarily, a taxpayer should be apprised of the Code sections and theories upon which the respondent relies prior to trial. However, even if a specific Code section, theory, or regulation has not been specifically raised in the notice of deficiency, if there is an absence of surprise on the taxpayer's part, he has no reason to complain. *Mills v. Commissioner*, 399 F.2d 744 (4th Cir. 1968); *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601 (1964); cf. *Commissioner v. Transport M & E Co.*, 478 F.2d 731 (8th Cir. 1973). Furthermore, if the alleged "new theory" merely clarifies or develops respondent's original determination, there is no "new matter."

---

[10]Whether sec. 48(c)(1) means that the property involved here is not to be considered "used section 38 property" ab initio, or whether it means that the property, although "used section 38 property," is "not to be treated as" used sec. 38 property, is a matter of semantics which is immaterial here. For clarity and ease of reference in identifying the two segments of the water and sewer system, we have employed the latter interpretation, but the end result is the same.

*Achiro v. Commissioner*, 77 T.C. 881 (1981); *Estate of Jayne v. Commissioner*, 61 T.C. 744 (1974). *Estate of Scharf v. Commissioner*, 38 T.C. 15 (1962), affd. 316 F.2d 625 (7th Cir. 1963).

In the instant cases, respondent's statutory notice of deficiency was based upon his determination that the water and sewer system involved herein did not qualify for the investment tax credit under section 38 of the Code. Further, it is clear from this record, as well as from the briefs, that petitioners knew that there was a controversy between them and respondent, not only as to whether the property qualified as "section 38 property" in general, but also as to whether the property should be considered as "new" or "used." Petitioners were thus clearly on notice that they would have the burden of proving that the water and sewer system met all the requirements of the Code with respect to section 38 property, including the requirements of section 48(b) and (c).[11] *Estate of Jayne v. Commissioner, supra.* We cannot see how petitioners were disadvantaged by respondent's making an argument that relies on a Code section that had already been placed in issue, nor can we understand how petitioners can claim surprise, when the prohibition raised by the respondent is expressed in clear language in the statute itself.[12]

In conclusion, we therefore hold that petitioners are entitled to an investment tax credit with respect to that portion of the water and sewer system which we have held to be "new section 38 property," and based upon the allocation formula which we have outlined above. We further hold, however, that petitioners are not entitled to any investment tax credit with respect to the portion of the water and sewer system which we have held to be "used section 38 property."

*Decisions will be entered under Rule 155.*

---

[11]Sec. 38 specifically refers to and incorporates the provisions of subpart B of part IV of ch. IA of the Code (secs. 46–50).

[12]Petitioners complain that respondent raised this particular argument for the first time on reply brief, thus giving petitioners no opportunity to respond to it. The point was well taken, as respondent recognized, and the Court allowed both parties to file supplemental reply briefs with respect to the point, thus giving petitioners full opportunity to brief their position.